On to our next case, which is Webb v. Beaversdorf v. Frawley, Mr. McKnight. Yeah, you can start. Good morning, may it please the court. My name is Neil McKnight. I represent the plaintiff appellants Thad Beaversdorf and Nicholas Webb. Mr. Beaversdorf and Mr. Webb had filed a verified complaint in the Circuit Court of Cook County's Law Division. The defendant, Mr. Frawley, removed the case to federal court. Shortly after removal, the case, Mr. Frawley also filed a motion to dismiss. The court conducted some discovery with respect to a motion for remand that was filed by my clients, Mr. Webb and Mr. Beaversdorf. Sorry, the court conducted discovery? The court ordered discovery. I think I misspoke there, I apologize. And the issues that are presented to the court are essentially the denial of the motion to remand and then the order to compel arbitration and to stay the litigation based upon what purports to be an arbitration agreement. I'm going to start with the jurisdictional question that's presented and the first question is whether or not the court erred in finding that the remand was improper based upon what we believe is a notice of removal that did not comply with 28 U.S.C. 1446. And the issue there is that the complaint as filed in the Circuit Court of Cook County did not contain a specific prayer for relief, rather it contained a sort of general allegation of damages based upon the jurisdictional divisions of the court itself. Another fact to note is that the complaint itself did not contain the Illinois Supreme Court Rule 222B affidavit which sets forth whether or not the plaintiffs are seeking more or less than $50,000. And so our issue is that at the point that the case was removed and at the time the case was removed, the only issues that were presented were an allegation or repeat of the allegations of the prayers for relief. And based upon that, what we'll say allegation or prayer for relief, it was insufficient to meet the requirements of 1446. And in fact, 1446 specifically addresses those circumstances when the specific... You're being very abstract. Can't you make this a little more fact-based? Let's put it this way. Okay. You wouldn't stipulate that each of the plaintiffs was seeking less than $75,000. Under those circumstances, it looks like you're just playing games with the jurisdictional question. No, I think the question then is whether or not the defendant moving forward has an obligation beyond simply stating it's worth this much based upon the prayer for relief and the notice of removal. Does the notice of removal require more than simply repeating the prayers? It's not just a question of what's in the notice of removal. This notice was sufficient. The question is whether there's a factual basis. That's why the district judge allowed the discovery. And when you all refuse to stipulate that the amount in controversy is less than $75,000, that's a pretty compelling indication that you're actually seeking more and you're just playing games. I think our argument is that the notice of removal was not proper. I understand that's your argument. Yes. But the demands for the notice itself on this particular issue are not high. If you raise an issue about it, then the parties can litigate the issue of the amount in controversy as happened here. I don't disagree with that. I think our issue is primarily with the notice of removal itself to the extent that it states nothing about the amount in controversy other than an aggregation of the claims which are purely jurisdictional amount. And the question then is whether or not that's appropriate for a notice of removal. Do they have to do more as required under the statute, which is a plain and concise statement of facts, and the grounds for the basis of the removal? And it's our position that the notice of removal did not contain the grounds for removal, and, therefore, it was inappropriate at that time. The grounds for removal are diversity of citizenship and more than $75,000 in controversy. And then if the plaintiff said nothing in response, then there's more than $75,000 in controversy, and you charge ahead in federal court. You make an issue of it, but then you refuse to stipulate. Perhaps it might be more useful if you talked about some of the arbitration issues. Yeah, I think I will do that. My only point was we believe that they didn't meet the threshold burden of getting to the next step of conducting discovery on the issue. I understand your position. And I'll move on based upon the discussions we have. The other issue is... What about the statement that Webb and Beversdorf each seek damages in excess of $100,000? But then that's... Or an amount in excess of $50,000 for each count of their two-count complaint? Yeah, because that constitutes an aggregation of the claims, and we don't think that's appropriate for the purposes of establishing what the jurisdiction is of $75,000. But I don't understand. If each is seeking damages in excess of $100,000, that's not aggregating the claims of both of them. Each count is alleged to seek an amount in excess of $50,000, but we believe that, as alleged and as written in the briefs below, that those are essentially duplicative damages under two theories of recovery, and so that it doesn't meet the threshold amount. There are two counts that aggregate to a $100,000 claim, and you're saying, what, the two counts are identical? We're saying that the damages claimed are the same under two different theories of recovery. Don't they cover different losses over different periods of time? We don't believe so. During their employment with Jeffries and some for lost opportunities after they were fired? I think that they cover the question of those lost commissions, and I think the commissions are for the period of time when they were working for Jeffries. And loss of good deals while at Jeffries in counts three and four, counts one and two on the loss of employment with Jeffries and future losses. So if the aggregation was mistaken, why didn't you just stipulate to less than $75,000 in damages? Because as we set forth, we don't know what one of the issues that we had is we don't know what the circumstances were with the termination of the other employees that are in the same situation as our employees. Each one of these guys would have made more than $75,000 in four, five, six months, right? Definitely. At Jeffries. Well, I think one of them would have. I don't know that both of them would. I think we stipulated that one of them was making $10,000 per month, and I don't remember the exact figure of Mr. Webb, but it was less than that. Or $10,000 per week, I think. No, it wasn't that much, but it was about $250,000 and $175,000. Were their annual salaries. So six months would get either one of them over. No doubt. And your lawsuit, if you had gone to trial, you would have been seeking more than this. I'm going to move on to the arbitration issues with respect to the claims. The other issue is the court's granting of a motion to dismiss the case, or at least motion to compel arbitration as a state of litigation case. And our argument with respect to those issues are whether or not there exists an agreement to arbitrate. And the bulk of this argument, and both of this finding in the court, was that both of these people were subject to the FINRA rules with regard to the code of arbitration procedure. And there's been case law that's been cited by my opposition that states that the FINRA rules constitute an agreement. However, you have to look at the entire scope of the FINRA rules. And in order to get to the FINRA rules, in order to get to the scope of the arbitration procedure, you need to have at least the signing of a U4 form, which is- Which Mr. Beversdorf did. He did sign a U4 form. I don't see how you've got an argument on Beversdorf. The only question I have with respect to Mr. Beversdorf is whether or not they also required or complied with Rule 2263 of the FINRA Code of Civil Procedure, which requires an explicit acknowledgement that you're waiving your ability to have a trial by jury and to be outside the FINRA arbitration. Because the language of the U4 form is limited in such that it suggests that it has to do with members and associated persons, and it may be with regard to disciplinary actions. And I think FINRA recognized that and adopted 2263 to come into compliance. And there's been no evidence in the record to establish that there's any contract that's been presented to the court that establishes as an arbitration agreement. There's a form U4 that was put there, but I don't dispute that Mr. Beversdorf at one point signed a U4. When he did that in his career, I don't know. I'm sorry. Maybe I'm forgetting this, but 2263? Yeah, 2263 is a requirement of- Where do we find this in your brief? It's in the reply brief. Okay. Did you raise this with the district court? We did raise it with the district court. Where? We raised it in our SIR reply to the response to the motion for dismissal, and I believe that it's at document 66. So where do we find this in your reply brief? The U4 form language is on page 2 of the reply brief. Yeah, I'm looking for your waiver argument. And I don't know that there's a reference to 2263, but it was in the record below. And has not been argued to us at all until a moment ago. Is that right? No, I don't believe so. As a basis for getting Mr. Beversdorf out from under an arbitration agreement? No, you're right. Okay. Can I ask you a couple of questions with respect to Mr. Webb? Mm-hmm. I want to ask the defense counsel just what agreement Mr. Webb signed here. If Mr. Webb and Mr. Beversdorf turn out not to be similarly situated, would your side want to have separate litigation and arbitration for the two plaintiffs? I think we'd have to because Mr. Webb is separate and apart from Mr. Beversdorf, and he has a separate set of rights, and he has indicated that he wants to have a separate trial in a court of law as opposed to in FINRA, so yes. Does it make any sense to have separate litigation and arbitration in this matter? Yes, it does, because Mr. Webb can then avail himself with a broader set of discovery tools that are available in the courts as opposed to being in FINRA. Well, why does he want that and Beversdorf doesn't? I think that based upon what the questions are from Judge Hamilton, I think the suggestion is that Mr. Beversdorf, by having executed the U4 form, may have waived his right to do that. Yes, I understand, but why is it that he would like, he would, he wanted arbitration and Webb doesn't? Well, I don't think, I think if it was Mr. Beversdorf's choice, he would rely upon 2263 and say that he hasn't waived his right explicitly with respect to these issues. No, but why? Why did they, why did the two of them split in this way in terms of? Because Mr. Beversdorf did execute a U4 at some point when he became a... Well, why didn't Webb? Because Webb is not a registered representative and he never took the securities licensing requirements that are for the various exchanges around the country, so he was never required to execute a U4. Could he have? I think he would only have been required to do that if... No, I'm not talking about required. Could he have done it? Sure, he could have done that. I'm not certain. Then why didn't he? Because it was never presented to him and I didn't think he was required. He didn't know about it? Well, he wasn't required to do that. Yes, I know. I'm asking why he didn't do it. Because it was never presented to him. That doesn't make any sense. I'm perhaps not understanding your question. He didn't know there were, what, this U4 thing? He didn't know about that? Well, he... Did he know about it or did he not know about it? I don't know whether he knew about it or not. Well, if he knew about it, would there be some reason why he would not sign it? Because it's a part of the requirements of becoming licensed under the various series as securities dealers and brokers, and he did not take that examination, so that wasn't presented to him as part of a package when you take that examination. But do you mean he couldn't have asked for arbitration? I suppose he could have. What do you mean you suppose he could have? He could have asked for arbitration if he had agreed to do arbitration, but he didn't do that. Why didn't he? I thought both of your clients asked for arbitration with Jeffries. They asked for arbitrations with Jeffries with respect to the issues presented in the Jeffries litigation, which has been dismissed and it's over with. Well, what exactly do you want for your clients? I mean, you do represent both of them, don't you? I do. Yeah. So what do you want for them? I would like them to have the opportunity to have their disputes with Mr. Frawley be heard in a court of law. But I thought Beversdorf was committed to arbitration. He's not committed to arbitration other than to the extent that the law commits him to arbitration through signing the U4 form. I don't get that. You're being evasive. Why isn't Beversdorf committed to arbitration by having signed that agreement? I don't believe so because they also didn't, and I raise the issue with respect to the Rule 2263, which is the acknowledgement of the waiver of arbitration. And because of the nature of this dispute, coming between two parties who are not, for example, Mr. Frawley is not a member as defined under FINRA. So, therefore, this is outside that scope of set of rules anyway. And I see that my time is up. Okay. Well, thank you. We'll give you a minute later, Mr. McClain. Mr. Canty or Ms. Canty? Sorry. Okay. May it please the Court, Don Canty, on behalf of Defendant Michael Frawley, if Your Honors will indulge me for a moment. I do have a bit of a presentation, but I understand that you're focused on a particular issue, and I will get there. And if you want to ask me questions along the way, obviously, I will answer them. I want to set the stage a little bit because this case did not start when Mr. Beversdorf and Mr. Webb sued Mr. Frawley. As Your Honors have noticed, this case arises as a result of the termination in 2013 of two traders who worked for Jeffries, a large securities firm. Their court complaint is that they were terminated from Jeffries when their supervisor, Mr. Frawley, instructed them to engage in transactions that Jeffries did not support. In 2013, shortly after they were terminated, they brought the FINRA arbitration against Jeffries, but they didn't name Mr. Frawley. When they initiated the FINRA arbitration, they signed a contract with FINRA called the Submission Agreement. And in the Submission Agreement, they agreed to submit their employment controversy with Jeffries and all related third-party claims to FINRA. Do we have that agreement in the record? Your Honors, it is publicly available in the FINRA case, but it's not in the record of this case because it was confidential and not available to us. Wait a minute. What? It was filed. Publicly available but confidential and not available to you. It was confidential before it was filed publicly in the case. Please stay close to the microphone. Oh, in the case that Mr. Webb and Mr. Biebersor filed against FINRA resulting from the FINRA arbitration. Wait a minute. A claim against FINRA or against Jeffries? They filed a claim against FINRA in this court, and when they filed the claim against, I'm sorry, they filed it in state court, and when they filed that claim in state court. But Judge Hamilton's question was that if it's publicly available, what does it mean that you don't have access to it? It became publicly available at some point late in our briefing, so we were unaware of it. We became aware of it. Well, you are now. We are aware of it now, Your Honor. And we... Is your contention that the FINRA submission agreement is now the operative agreement by both plaintiffs to arbitrate this dispute with Mr. Frawley? It's the employment agreement that Mr. Webb signed with Jeffries along with the submission agreement that they submitted the claim. Mr. Webb submitted his claim to FINRA because he had an arbitration provision in his employment agreement and because of FINRA's... It was not a compulsory provision, though, was it, for Mr. Webb? I think it is compulsory, Your Honor, if you read it. I have read it, I believe. Do you want to tell me what you're looking at? I will, Your Honor. You're saying that Webb didn't have to sign anything? He was bound? What was it that bound him without his consent? First of all, it's the FINRA rules because he's an associated person under FINRA, and the rules do not say you're required to sign a U-4 before you're subject to arbitration. He would be subject to arbitration with a customer, right? Yes. Okay. I don't see how the FINRA rules require somebody like Webb to submit an employment dispute to arbitration. Can you show me? Yes. FINRA Rule 13-200 says that associated persons under FINRA who have disputes are required to submit those to arbitration. It says a dispute must be arbitrated under the code if the dispute arises out of the business activities of a member or an associated person and is between or among members, members and associated persons, or associated persons. So you don't need a piece of paper with Webb's signature on it agreeing to arbitration? I think the piece of paper with Webb's signature on it agreeing to arbitration is the employment agreement with Jefferies. And is that Supplemental Appendix 229? About an eight-page agreement? Yes, I believe so, Your Honor. Okay. I see a venue provision there concerning arbitration. I don't see an agreement to arbitration. Well, it says you hereby consent that any arbitration proceeding brought with respect to matters related to your employment or this agreement shall be brought before FINRA. Right. Any arbitration shall be brought before FINRA. That's why it's a venue provision. But it doesn't say we will arbitrate any dispute, does it? In connection with the FINRA rules that do say associated persons will arbitrate any dispute, you add this employment agreement in, and then you get to the submission agreement where Mr. Webb did agree to arbitrate his dispute with Jefferies. Why did Biebersdorf sign the U-4 form and not Webb? You know, looking at the FINRA website, we have not seen evidence that Mr. Webb signed the U-4. But in his affidavit, he does not say that he didn't sign the U-4. He doesn't have to prove he didn't. You're trying to compel arbitration. You've got his signature on a piece of paper that says, if we arbitrate anything, we'll do it in New York. That's not a commitment to arbitrate. Now you're telling us that you think FINRA rules apply to anybody who's an employee in their employment disputes without having actually agreed to arbitration and without a U-4 for him. And we'll, I hope, circle back at some point to the submission agreement, which sounds like an entirely new theory. It's not any employee who is subject to FINRA arbitration. It's a person who is registered or a natural person engaged in the investment, banking, or securities business. So it's a particular type of employee. He's a trader, right? A trader. Yeah. Okay. So have other courts enforced arbitration based only on 13-200 against people who have not signed agreements that require them to arbitrate? I don't know. That seems kind of critical to your theory to require Webb to arbitrate here because your venue provision in the employment agreement doesn't do it. What's odd about it, what's particularly odd, is that if the U-4 isn't required for arbitration, why did Beversdorf sign it? Pointless, according to you. Utterly pointless. I think it's just a confirmation of the rules. Utterly pointless. I think that signing the U-4 just confirms that those who are ---- Well, it just confirms. That's extremely vague because your theory doesn't require any confirmation. Well, by agreeing ---- You're not saying that because Beversdorf did not confirm by signing the U-4. I mean Webb, sorry. In the employment ---- You're saying, I mean your theory is because Webb didn't sign the U-4, that's serious. Now you say, well, the U-4 is just confirmation, no big deal. You've got to make up your mind. Well, I'm saying that the rules require associated persons to arbitrate and that the employment agreement signed by Mr. Webb ---- So what's the U-4 doing? I think the U-4 is just a confirmation that somebody ---- You're saying it's utterly irrelevant. I don't believe it's utterly irrelevant. Beversdorf gets nothing for failing to sign it. He's in exactly the same position as Webb. I believe that ---- So the question is, why did Webb want to confirm by signing the U-4 and Beversdorf didn't? I believe that Beversdorf signed the U-4. And why Mr. Beversdorf signed the U-4 at the time of his employment ---- That's fine. That Jeffries began and Mr. Webb did not, we don't know. But we do know that Mr. Webb signed an employment agreement where he agreed that any arbitration shall be brought before FINRA, not just in New York, but before FINRA. That's different from saying you have to arbitrate. That's saying where the arbitration takes place. But what this goes on to say is if the parties are permitted to bring such action in a state or federal court, traders who work for Jeffries are not permitted to bring such action in a state or federal court because they agreed by working with a FINRA member and by operation of the FINRA rules that disputes with a FINRA member would be arbitrated before FINRA. Then the submission agreement, the dispute with Jeffries is an employment dispute. And under the employment agreement, it said that any proceeding, any arbitration proceeding brought with respect to matters related to your employment shall be brought before FINRA. So what would be an example of something Webb had done that would force this arbitration, this FINRA arbitration? Something that Webb had done? Yeah. If he has a dispute over his employment with Jeffries or a dispute with Mr. Bieberstorff or a dispute with Mr. Frawley, given that the scope of the FINRA rules are associated persons and members. Well, I don't know much about it, but I would have thought FINRA would be interested in the activities of people like Webb and Bieberstorff with customers of the firm rather than some internal employment fight. Why would FINRA be interested in the internal employment squabbles within a firm? That has nothing to do with their work as financial analysts. Well, it could well have something to do with their work as financial analysts. It doesn't have to, though. I mean, what if he was fired for soliciting sex from a secretary? Would that require arbitration? That might not relate to the business activities of a FINRA member as defined in the rules, but certainly what happened, the allegations here do relate to the business activities of them as traders and whether they were directed by Mr. Frawley not to execute certain trades. That is the issue in both the arbitration before FINRA with Jeffries and the issue in the state court complaint they brought here. And the problem with splitting, letting them arbitrate with Jeffries before FINRA and then bringing a state court complaint in a different forum is then you're claim splitting over the same operative facts relating to the same issues and letting two separate fora review the same series of events. Well, actually, suppose it were just litigation. I don't think there would be anything wrong with them. It might be inefficient, but there wouldn't be anything wrong with them suing Jeffries in New York in court and then coming to Illinois to sue Frawley, would there be? I believe so because they agreed under the FINRA rules to arbitrate their employees. I'm trying to get away from arbitration. You were talking about claim splitting, which is a more familiar concept from litigation. And you've got two different defendants. One may be subject to jurisdiction in one place and not in another. You can sue them in different suits. It still seems inefficient. Well, look, this fight over forum shopping here is pretty inefficient. You all have spent an amazing amount of time and energy on deciding just where this dispute is going to be held, and you could conceivably wind up getting two, one for Beversdorf and one for Webb. Could I ask you to go back to this publicly available confidential document, the submission agreement with FINRA? It's not in our record? No. Did you argue that as a basis for arbitration before the district court? I believe we did mention the submission agreement before the district court, but it came in fairly late. We weren't aware of it. Okay. You've seen it now, correct? Yes. Okay. Can you read us the operative language you rely upon? Yes. And tell us where we can find it? I'm not sure we should, but let's at least air this out right now. Yes, Your Honor. The submission agreement is publicly available in Webb v. FINRA. It's number 116CV04664, ECF number 1-1 at 14. The Northern District of Illinois Civil Action. Yes, Your Honor. Okay. Okay. The provision is that the, and this is signed by both Mr. Webb and Mr. Biebersdorf, the undersigned parties hereby submit the present matter in controversy as set forth in the attached statement of claim, answers, and all related cross-claims, counterclaims, and or third-party claims which may be asserted to arbitration in accordance with the FINRA bylaws, rules, and code of arbitration procedure. What we believe, Your Honor, is the third-party claim against Mr. Frawley is a claim that should have been submitted to FINRA arbitration given this submission agreement. He would just be a co-defendant, not a third-party defendant, right? He could have been. Well, he would be a. Jeffries wouldn't have a claim against Frawley, would he? That would be a third-party claim. Right. He'd be an additional defendant or claimant. Okay. What happens to the lawsuit if Webb can't be ordered to arbitrate? I would assume that there would be instructions back to the district court that the claim against Webb would not be. Wouldn't it fall out of the district court because the minimum amount and controversy requirement was not satisfied? Well, Mr. Webb has claims that satisfy that exceed $75,000. He has a fraud and tortious interference claim. Each claim seeks an excess of $50,000 each, and each of them seeks different relief. And Mr. Webb made $175,000 a year as a trader. So the tort claims that he brought against Frawley exceed $75,000 in and of themselves. It's not an aggregation with Mr. Beaversdorf's claims. So, but you want Webb to arbitrate? We would like Mr. Webb to arbitrate, yes. Why? Because we believe it's the appropriate forum. We don't think that Mr. Frawley's suit should be subject. No, no, no. What's in your business interest? What do you mean appropriate forum? Why is it in your business interest to have arbitration rather than litigation? Because Mr. Frawley would be subject to two separate suits, one by Beaversdorf in arbitration, one by Webb in court. FINRA is a more streamlined arbitration process than a court proceeding. But if you have separate suits by Webb and Beaversdorf, might that, as they say, affect federal jurisdiction? Can Beaversdorf show that, you know, more than $50,000 is at stake in his case if he were all by himself? I believe so. He also had two tort claims, a fraud, tortious interference, and he made $250,000 a year, and he's seeking lost salary as well. And in any event, the amount in controversy between the two plaintiffs cannot be aggregated. Correct. But you've got ample reason to think each of them is seeking more than $75,000 on his own. Yes, Your Honor. Okay. What do they mean by an amount in excess of $50,000 for each count of their two-count complaint? Does that mean they're each seeking more than $100,000? Yes. There's each individual plaintiff seeks, has filed a tortious interference with contract claim. The contract is an employment agreement where Mr. Beaversdorf makes $250,000 a year and Mr. Webb makes $175,000 a year. So that count alone, if they were to recover lost salary for any amount of time greater than a few months, exceeds $75,000. Then there's a fraud claim, and the fraud claim, we believe, increases the stakes of litigation because they are seeking commissions that they would have earned had Mr. Frawley not allegedly defrauded them while they were employed by Jeffries. So if they could just... You see those two claims, there may be some overlap, is that right? Yes. In terms of time, but not complete. Exactly. Okay. Okay. Well, thank you very much, Ms. Canty. Thank you, Your Honor. So, Mr. McKnight, do you have anything to say briefly? The first point I want to make is that the discussion of the submission agreement involved a different dispute, and it was not argued in the trial court, and it's not part of the record. And so I don't think it's dispositive of the issues anyway. But the other issue I wanted to raise with an answer question to you, Judge Posner, was that you asked the question about why Mr. Webb did not file a U-4. And I didn't give you the complete answer, and I apologize for that. But the U-4 essentially is an application for securities industry registration or transfer. And so because he never applied for securities registration or transfer, that's why he never executed U-4. And so only if he had actually applied would he execute U-4, and he didn't do that. And that's the reason why he did it, because the language about arbitration, which I might add is much more limited in the U-4 than it is in the 2263, is contained as part of the application process when you submit your U-4. So they want you to know up front, and that's the reason why it's there. And for the reasons, we'd ask that the matter be returned to the trial court for trial on the merits, and particularly with respect to Mr. Webb. Thank you. Okay. Thank you very much, Mr. McKnight.